IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRY GALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12-CV-00617 |
| | ) | |
| UPMC HORIZON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is the MOTION FOR SUMMARY JUDGMENT (ECF No. 32) filed by Defendant UPMC Horizon ("Defendant" or "Horizon"), with brief in support. Plaintiff Terry Gale ("Plaintiff") filed a brief in opposition (ECF No. 39), to which Defendant filed a reply (ECF No. 43). The motion has been fully briefed and the factual record has been thoroughly developed via the parties' concise statements of material facts ("CSMF") (ECF Nos. 34, 40, 41), the appendices, and exhibits. Accordingly, the motion is ripe for disposition.

### I.   BACKGROUND

This is an employment discrimination case, in which Plaintiff complains of a variety of allegedly discriminatory treatment over two decades, culminating in the termination of his employment in 2011. The facts have been derived from UPMC Horizon's CSMF and the attached exhibits, insofar as they have not been disputed, and have been viewed in the light most favorable to Plaintiff.

   A. Factual Background

   Plaintiff became employed at Shenango Valley Medical Center as a radiologic technologist in Farrell in 1991. He was hired by Deborah Gurtner ("Gurtner"), the Director of Imaging Services. Defendant UPMC Horizon acquired the facility in 1995. In addition to the

1

Farrell facility, Defendant also operates a campus in Greenville.

Kathy Palombi ("Palombi") has been Plaintiff's direct supervisor since 1995, and she reports directly to Gurtner. Palombi works at the Farrell campus. Gurtner, who oversees both Farrell and Greenville, has offices at both locations, but during the relevant timeframe, she primarily worked at Greenville.

Plaintiff has only worked the midnight shift at the Farrell facility, and rarely interacted with employees at Greenville. During his shift, Plaintiff was the only radiologic technologist on duty. Because Palombi and Gurtner have never worked the same shift as Plaintiff, he rarely had face-to-face interactions with them.

The allegedly harassing treatment toward Plaintiff began sometime in 1991, before Defendant owned the Farrell facility. At an unspecified date that year, Plaintiff burnt his hand on a piece of x-ray equipment. In response, Gurtner told him, "possibly this job field is not for you. Maybe you should just go find a nice, little band to play in."[1] Pl.'s Dep. 10 (ECF No. 35-1). Other incidents with co-workers and supervisors occurred sporadically over the next twenty years. Gurtner referred to Plaintiff as "a good little boy . . . once every two months when [he] would see her . . . ." Pl.'s Dep. 13 (ECF No. 35-1). It is unclear from the record whether this took place every time Plaintiff encountered Gurtner; however, the last time Plaintiff heard such a comment was sometime in 2009. Pl.'s Dep. 13 (ECF No. 35-1). Starting in or around 1992, members of the nursing staff, including Cheryl Caszatt, were reluctant to help him when he asked for help. Also in 1992, Plaintiff gave Gurtner a pet hamster. After the hamster bit Gurtner's son, she approached Plaintiff and asked him if something was wrong with the animal. Another incident took place about fifteen years later, on an unspecified date in 2007, when Plaintiff took a leftover pizza from a work-related party and was later questioned by Palombi

---

1. Plaintiff testified that he plays in a band in his free time.

2

about what happened to it. Beginning in 2008, Plaintiff was asked by Palombi to clean and defrost the refrigerator monthly. He testified that he is unsure if he was the only person asked to do this task, and when he asked Palombi why she made him do this, she told him it was because he worked the night shift. Furthermore, from approximately 2008 through 2010, Plaintiff's lunches were removed from the radiology department refrigerator when he did not put his name on it and thrown away, as was required by Defendant's policy. He claims that because his lunch was the only thing in the refrigerator during his shift, Horizon knew that it belonged to him.

The next incident took place sometime in 2009, when Plaintiff went to the critical care unit to perform an x-ray. Once there, he heard Tammy Hedglen ("Hedglen"), a registered nurse in that unit, complaining about something and approached her to ask what was the matter. In response, Hedglen told Plaintiff that "it wasn't [his] problem. [He] was part of the problem rather, that [he] was born with a penis." Pl.'s Dep. 16 (ECF No. 35-1). Sometime after this incident, Plaintiff wrote a statement in which he explained, "I knew [Hedglen's] anger was not directed at me personally but rather at the other male persons either at work or outside of work." Def.'s CSMF, Ex. 2 (ECF 35-2). Plaintiff later testified in his deposition that he did, however, feel included in the statement. Pl.'s Dep. 17-18 (ECF No. 35-1).

Plaintiff never complained to anyone about any of these incidents, although he knew of Defendant's harassment-free workplace policy and received annual training on it.[2] Furthermore,

---

2. Plaintiff testified that he did not utilize the policy's reporting procedures because he did not believe that the treatment to which he was allegedly subjected fell within its definition of harassment. The policy defines harassment as:

> spoken, written or physical conduct that demeans or shows hostility or hatred toward an individual because of his or her race, color, religion, gender, genetics, sexual orientation, national origin, age, disability or military affiliation, or that of his or her relatives, friends, or associates, and that:
> a. has the purpose or effect of creating an intimidating, hostile, or offensive working environment;
> b. has the purpose or effect of unreasonably interfering with an individual's work performance; or

3

in a performance review dated June 20, 2001, Plaintiff wrote that he was satisfied with his job. The next year, he wrote in his performance review that he was very proud of the radiology department at Horizon. He also wrote that he had referred several friends to UPMC for testing and treatment.

During his time at Horizon, Plaintiff was the subject of a number of disciplinary actions and was also notified in yearly performance reviews that he needed to improve his communications skills. On July 6, 1992, he received a written reprimand from Gurtner for showing disrespect for a physician's orders and questioning orders. On May 7, 1998, Plaintiff received another written warning for having an inappropriate conversation with a patient regarding the necessity of having an x-ray performed. After the incident which gave rise to the reprimand, Plaintiff called the physician who ordered the x-ray an "asshole" in the presence of a nurse. He was later asked by Defendant to write a statement explaining his version of events. Plaintiff was disciplined again in January 2000 after making a statement to a nurse that she perceived as threatening. The next year, he received another warning for having an inappropriate conversation with a patient. Also in 2001, Plaintiff had an incident with a male physician who believed he was not doing his job and reported this to Gurtner. Afterward, Plaintiff provided a written statement to Palombi setting forth his position. In 2005, Plaintiff was accused of harassment by a male co-worker, and just as before, Plaintiff was asked to provide a written statement explaining his view of what had transpired.

Three other disciplinary actions are particularly relevant to Plaintiff's claim because they directly preceded his termination. On July 1, 2009, Gale received a warning for having an inappropriate interaction with emergency department ("ED") staff. According to the written

---

        c.    otherwise adversely affects an individual's employment opportunities.

4

warning, Plaintiff was disciplined for "yanking on/banging on ED doors that have been designated as 'locked down' for security purposes; hanging up phones on ED physician and ED nurse; improper conversational confrontation with ED nursing staff; unsuitable use of telephone (pretending to leave recorded message when answering ED calls); conform[ing] to department dress code policies." Def.'s CSMF, Ex. 2 (ECF No. 35-2). The warning stated that the "next occurrence will result in a 3 day suspension." Def.'s CSMF, Ex. 2 (ECF No. 35-2). On February 1, 2010, Plaintiff received a final written warning in lieu of suspension after he performed an x-ray on the wrong patient. Plaintiff claimed that he was directed to the wrong patient by a nurse. He acknowledged, however, that he did not follow the correct procedures in x-raying the patient. The warning notice stated that "[f]urther violations of policy will result in corrective action up to and including termination of employment." Def.'s CSMF, Ex. 2 (ECF No. 35-2) (emphasis in original).

The incident that led to Plaintiff's termination occurred on March 9, 2011. Early that morning, Dr. Tracy McCoy ("McCoy") ordered an x-ray on a patient in a unit where Plaintiff had just completed an exam. Plaintiff learned about the order right after he left the unit, and when he returned to perform the exam, he stopped at the nurses' station and, referring to Dr. McCoy, stated, "[i]s someone trying to be considerate?" Pl.'s Dep. 175 (ECF No. 35-1). He made the statement in the presence of two nurses, and the patient was also in the room (though the parties dispute whether she was within hearing range). During the encounter, Plaintiff also said, "someone was being purposely disrespectful; she saw me in here earlier." Pl.'s Dep. 177 (ECF No. 35-1).

Later that date, Dr. McCoy filed a written complaint about Plaintiff with Palombi. After receiving Dr. McCoy's complaint, Palombi launched an internal investigation to determine the

5

appropriate discipline, during which she obtained statements from the two nurses who witnessed the event, which were received on March 14, 2011. Plaintiff also provided her with a written statement, as he had done after earlier incidents of alleged misconduct. The statement reads, in its entirety, as follows:

> On Tuesday nightshift, Wednesday morning, I completed my portable exams in CCI. Upon returning to the x-ray Department, I checked the computer for new orders and saw another exam for a portable x-ray in CCU. I went back to the unit to perform the exam and saw Dr. McCoy at the nurses' station and verbalized that I thought it was inconsiderate that I wasn't verbally notified of the exam while I was previously there completing an exam on another patient. It is my experience that when physicians add orders for exams, while I'm there, that they ask me if I have extra films so I can complete the newly ordered exam. I verbalized my frustration, but it was not directed at anyone in particular. I meant no disrespect. Upon returning to the x-ray dept. I received a phone call from Dr. Geissen. She asked, "What is your problem, do you have a problem doing x-rays?" I was taken by surprise because I had not seen or talked to Dr. Geissen that morning. I responded that, "I do not have a problem with any 'orders for x-ray exams.'" She continued by verbally threatening to report me for not doing my job. I presented the occurrence to Kathy Palombi, my immediate supervisor, on Thursday morning.

Def.'s CSMF, Ex. 2 (ECF No. 35-2). Plaintiff testified in his deposition that he wrote the statement, in part, because he hoped that he would not be disciplined after his supervisors heard his version of the incident. Pl.'s Dep. 196 (ECF No. 35-1). On March 30, 2011, Plaintiff was notified of his termination via a letter, which indicated that he was being discharged "due to the violation of the UPMC policy HSHR-0704 Corrective Action; specifically profane or inappropriate language or indecent conduct, particularly in proximity to patients or visitors." Def.'s CSMF, Ex. 2 (ECF No. 35-2). Plaintiff was eventually replaced by another male radiologic technologist.

Following his termination, Plaintiff filed a grievance with Defendant, in which he refuted the allegation that he used profane, inappropriate or indecent language. He also contested the severity of his discipline. The grievance did not, however, mention the allegedly ongoing

6

harassment.

   B. **Procedural History**

Plaintiff cross filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Resources Commission ("PHRC") on May 13, 2011. Plaintiff initiated this action on May 9, 2012, by filing a three-count complaint, raising claims for (1) gender discrimination, (2) hostile work environment, and (3) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). On October 19, 2012, Plaintiff filed his First Amendment Complaint (ECF No. 20), which added identical claims under the Pennsylvania Human Relations Act, 43 P.S. 951 *et seq.* ("PHRA"). On November 21, 2012, Plaintiff filed a stipulation of dismissal as to Count I of the First Amended Complaint (gender discrimination under Title VII) (ECF No. 24). The parties also stipulated to the dismissal of Count IV (gender discrimination under the PHRA) (ECF No. 28). Horizon filed its motion for summary judgment on March 22, 2013, in which it seeks summary judgment as to all of Plaintiff's remaining claims: Counts II and V (retaliation under Title VII and the PHRA) and Counts III and VI (hostile work environment under Title VII and the PHRA).

## II.  STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The nonmoving party must raise "more than a mere scintilla

of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Liberty Lobby*, 477 U.S. at 249). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

### III. DISCUSSION

**A. Retaliation Claims under Title VII and the PHRA**

Plaintiff alleges that he was retaliated against for submitting the written statement to Palombi describing the incident with Dr. McCoy, in violation of Title VII and the PHRA. Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation. Because "[t]he same standards, decisional law, and analysis apply to retaliation claims under both statutes," the Court will analyze Plaintiff's claims together. *See Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 543 (W.D. Pa. 2010) (citation omitted).

> Title VII makes it unlawful:
>
> for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that (1) he engaged in a protected activity, (2) Defendant took an adverse employment action against him, and (3) there is a causal link between the protected activity and the adverse action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (citing *Nelson v. Upsala*

8

*Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Defendant argues that Plaintiff's submission of the written statement about the incident leading up to his termination does not constitute a protected activity. Title VII's anti-retaliation provision "protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Id.* at 341 (citing *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)). Because the "participation clause" applies only if an EEOC charge is pending – which was not the case here – Plaintiff's claim must be analyzed pursuant to the "opposition clause." *See Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 440 (W.D. Pa. 2010).

The Third Circuit Court of Appeals has held that a person engages in protected oppositional conduct when he lodges a protest with a good faith belief that his employer is engaging in a practice made unlawful by Title VII. *Anan v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). Importantly, the opposition need not come in the form of a formal complaint. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). Instead, it can take the form of "'informal protests . . . including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges.'" *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). The Court must, therefore, examine the "message being conveyed rather than the means of conveyance" to determine whether Plaintiff's conduct was protected. *Id.* (citing *Barber*, 68 F.3d at 702).

In this regard, the message must at least implicitly convey the speaker's protest of discriminatory practices, such that the employer is put on notice of the claim of a particular type

9

of discrimination. *See Mosaka-Wright v. LaRoche Coll.*, No. 11-1139, 2012 WL 3060151, at *3 (W.D. Pa. July 25, 2012); *Isler v. Keystone Sch. Dist.*, No. 07-1335, 2008 WL 3540603, at *10 (W.D. Pa. Aug. 12, 2008). This is a purely objective inquiry: the subjective intent of the person conveying the message is irrelevant. *Curay-Cramer*, 450 F.3d at 135. Thus, while the statement need not expressly use the term "discrimination," "it must be possible to discern from the context of the statement that the employee opposes an unlawful practice." *Id.* at 136. "[A] general complaint of unfair treatment" that cannot be reasonably construed as relating to alleged discrimination cannot suffice. *Id.* (citation omitted).

Plaintiff has attempted to characterize the March 2010 statement as an "informal complaint," which purportedly put Horizon on notice that he felt he was being threatened and harassed by one female doctor (apparently Dr. McCoy) and treated unfairly by another (apparently Dr. Greissen).[3] *See* Pl.'s Br. in Opp. at 13 (ECF No. 39). To that end, he testified to his belief that his statement was sufficient to alert Defendant of his allegations and that he expected "something to be done" as a result. Pl.'s Dep. 197 (ECF No. 35-1).

However, viewing the statement from an objective standpoint as the Court must do, Plaintiff's after-the-fact interpretation cannot save his claim. He made the statement in the midst of an inquiry into his alleged violation of Defendant's work rules. As the handwritten notation on the disciplinary action report ("DAR") following the March 9 incident indicates, Palombi obtained statements from all of the relevant witnesses as part of its inquiry on March 10, 2011. According to the notes on the DAR, the nurses who witnessed the incident submitted written statements on March 14, 2011, and Plaintiff submitted his statement on March 17, 2011. When considered in this context, a reasonable jury could not construe Plaintiff's statement as anything

---

3. Although Plaintiff now attempts to characterize Dr. McCoy's conduct as harassment, he testified in his deposition that it was *not* harassment for Dr. McCoy to ask him to perform an x-ray. Pl.'s Dep. 189 (ECF No. 35-1).

more than a description of his version of events made in an attempt to explain away his own conduct. Plaintiff makes no mention of his membership in a protected class. He makes no mention of his belief that the two doctors named in the statement engaged in the alleged conduct because of his gender. He makes no mention of what action he wanted Palombi to take in response to his statement. He does not even use the term "harassment" or hint that the two instances described were part of a larger pattern of behavior by his co-workers and supervisors. There was simply nothing in the statement to put Defendant on notice that Plaintiff believed he was being subjected to any treatment actionable under Title VII. As a result, Plaintiff has not established that he engaged in a protected activity, and his claim must fail. *See Mikell v. Marriot Int'l, Inc.*, 789 F. Supp. 2d 607, 618-19 (E.D. Pa. 2011) (holding that letter sent by plaintiff's attorney after disciplinary proceedings against plaintiff had begun describing employer's conduct did not amount to protected activity); *Murray v. Sears, Roebuck and Co.*, No. 09-702, 2010 WL 1433426, *7 (N.D. Ohio Apr. 7, 2010) (concluding that written statement made at direction of supervisor as part of investigation into workplace misconduct did not constitute protected activity).

Assuming that Plaintiff could establish that he engaged in a protected activity, his claim would still fail because he cannot show a causal connection between his conduct and the decision to terminate him. Generally, temporal proximity between protected a activity and an adverse employment action is sufficient to create an inference of causation. *E.E.O.C. v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997). Nevertheless, "an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity." *Curay-Cramer*, 450 F.3d at 137. In *Curay-Cramer*, a teacher at a Catholic school was terminated after signing a pro-choice advertisement that appeared in a

local newspaper. *Id.* at 132. The day the advertisement ran, the plaintiff was called into her supervisor's office and told that the school was considering terminating her. *Id.* at 132, 137. Before her termination was made final, the plaintiff told the school that she planned to oppose her termination as discriminatory. *Id.* at 137. After her termination, she filed a retaliation claim, in which she alleged that she was fired because she raised the issue of discrimination. *Id.* Upholding the district court's dismissal of the claim, the Court of Appeals explained "that an employee may not insulate herself from termination by covering herself with the cloak of Title VII's opposition protections *after* committing non-protected conduct that was the basis of the decision to terminate." *Id.* (emphasis in original).

The same is true here, as the wheels of Plaintiff's termination had already been set in motion by the time he provided his statement to Palombi. He received a final written warning in lieu of termination on February 10, 2010, and knew that any further disciplinary actions could result in termination. The final straw came on March 9, 2011, when the incident with Dr. McCoy occurred and UPMC's inquiry into whether Plaintiff should face termination began, with Palombi eliciting the various witness statements. Plaintiff cannot base his retaliation claim on conduct that took place in the midst of that inquiry. Were the Court to hold otherwise and conclude that "subsequent conduct could prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial strait-jacket not contemplated by Congress." *Curay-Cramer*, 450 F.3d at 137. Therefore, Horizon's motion will be **GRANTED** as to Plaintiff's retaliation claims under both Title VII and the PHRA.

### B. Hostile Work Environment Under Title VII and the PHRA

Horizon also seeks summary judgment on Plaintiff's hostile work environment claims

under Title VII and the PHRA.[4]  The hallmark of a hostile work environment claim is "repeated conduct that so permeates the workplace with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of employment." *Mahone v. UPMC*, No. 06-628, 2007 WL 2461801, at *6 (W.D. Pa. Aug. 23, 2007) (citation and quotation marks omitted).  Plaintiff bases his claim on the following comments and incidents spanning a twenty-year period: (1) unwarranted disciplinary actions taken against him between 1992 and 2010; (2) Gurtner's statement in 1991 that, "possibly this job field is not for you;" (3) Gurtner's references to Plaintiff as a "good little boy;" (4) Hedglin's statement in 2009 that he was part of the bigger problem because he was "born with a penis;" and (5) several other allegedly inappropriate comments and actions occurring at unspecified dates throughout his employment, including the repeated disposal of his lunch.  Defendant advances a battery of arguments in support of its motion, which the Court will address in turn.

    1. <u>Timeliness Issues</u>

Defendant contends that Plaintiff's claim is untimely because the allegedly discriminatory conduct occurred outside of the statutory filing period.  Plaintiff cross filed his administrative charge on May 13, 2011, and the parties agree that the limitations period extended 300 days back from that date, or July 17, 2010.  *See* 42 U.S.C. § 2000e-5I(1).  Plaintiff concedes that a majority of the incidents of alleged harassment occurred beyond that date.  Nevertheless, he argues that his claim is saved by the continuing violation doctrine.

Generally, only acts that occurred within the statutory period are actionable under Title VII.  *Mandel*, 706 F.3d at 165.  However, "[u]nder the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile

---

4.  The analysis for a hostile work environment claim is the same under Title VII and the PHRA.  *See Kurschinske v. Meadville Forging Co.*, No. 06-87, 2007 WL 1811196, at *2 (W.D. Pa. June 21, 2007).

13

work environment claim." *Id.*

As an initial matter, in analyzing Plaintiff's hostile work environment claim, it is necessary to distinguish between "discrete" acts and "non-discrete" acts because the former are "individually actionable" and thus must be brought within the statutory period "or they will not support a law suit." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006). The latter, on the other hand, may be aggregated to form the basis of a hostile work environment claim. *Id.* The Supreme Court has set forth "fairly precise guidance as to what sorts of acts are 'discrete.'" *Id.* Typically, they are singular events in a person's employment such as "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, ***wrongful discipline***, denial of training, wrongful accusation." *Id.* (emphasis added). By contrast, "non-discrete" acts most often take place "over a series of days or perhaps years," and it is their cumulative effect over time that gives rise to a claim. *Morgan*, 536 U.S. at 115.

In view of that distinction, the Court finds that Plaintiff's allegations of unwarranted discipline from 1992 until 2010 "fall into the category of discrete acts." *See O'Connor*, 440 F.3d at 127. Plaintiff may not group these incidents together under the heading "hostile work environment," thereby allowing him to revive otherwise stale claims that had to be raised within 300 days of their occurrence. *See Hayes v. Del. State Univ.*, 726 F. Supp. 2d 441, 454 (D. Del. 2010) (finding that alleged wrongful accusations were "discrete acts which are subject to the time bar"); *Fusco v. Bucks Cnty.*, No. 08–2082, 2009 WL 4911938, at *8 (E.D. Pa. Dec. 2009) (holding that wrongful discipline was discrete act and thus could not be part of plaintiff's hostile work environment claim). Therefore, Plaintiff's hostile work environment claim must be limited to Gurtner's 1991 statement, Gurtner's references to him as a "good little boy," Hedglin's 2009 statement, and the other incidents, such as the removal of his lunch.

The Court must now determine whether Plaintiff's claim, when properly limited to non-discrete acts, may be considered as a continuing violation. To establish a continuing violation, Plaintiff must show that (1) at least one act fell within the statutory period, and that (2) all of the acts making up the claim were part of single, ongoing pattern or practice. *Id.* at 165-66 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002)). Once a continuing violation is proven, the entire period in which the conduct took place may be considered even though "some of the component acts of the hostile work environment fall outside the statutory time period." *Morgan*, 535 U.S. at 117.

Plaintiff argues that because his termination took place within the statutory period, he has satisfied the first requirement for establishing a continuing violation. However, as the Second Circuit Court of Appeals has persuasively explained, "the mere fact that an employee was dismissed within the statutory period cannot be used 'to pull in [a] time-barred discriminatory act.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (quoting *Morgan*, 536 U.S. at 113); *see also Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir. 2000) (finding that plaintiff's "termination did not qualify as an act within the time period because the termination related to disparate treatment not harassing conduct"). Thus, Plaintiff may not simply rely on his termination as the lynchpin of his hostile work environment claim. This act was isolated, discrete, and entirely unrelated to the allegedly inappropriate comments and behavior that constitute Plaintiff's claim. Instead, he must come forward with evidence of some other discriminatory act that took place within the statutory period, and also establish that such act had some connection to the previous conduct.

On this point, Plaintiff argues that it is "likely that regular disposal of his lunches

15

extended into [the statutory] period as well." Pl.'s Br. in Opp. 12 (ECF No. 39). It is entirely unclear whether that is actually the case. In his deposition, Plaintiff testified that Palombi threw away his lunch any time he left it in the refrigerator without his name on it. Pl.'s Dep. 26-27 (ECF No. 35-1). Plaintiff did not pinpoint the dates on which this occurred, stating only that it happened in "2008, 2009, 2010." *Id.* at 27. It is also unclear whether any of the other allegedly inappropriate conduct continued into this period, as Plaintiff did testify that he was asked to clean the refrigerator as late as 2011, although he makes no mention of that in his brief.

Nevertheless, even generously assuming that some of the conduct continued into the statutory period, Plaintiff has not shown that any of such conduct was part of an ongoing practice or pattern of discrimination. With respect to the disposal of his lunches, Plaintiff was asked during his deposition, "if you had your name on [your lunch], it was not thrown out; is that right?" Pl.'s Dep. 26-27 (ECF No. 35-1). He responded, tellingly, "[t]hat's what the policy stated." *Id.* Accordingly, the removal of his lunch was not part of some larger plot to make Plaintiff's life at work miserable; it was, as he concedes, the result of Defendant's policy requiring names to be placed on items in the refrigerator. Furthermore, Plaintiff has adduced no evidence to establish the requisite connection between these incidents and the other allegations of discriminatory conduct which allegedly occurred prior to July 2010. For the most part, they involved different persons, acting individually and sporadically over a span of twenty (20) years. *See Ferguson v. Merck & Co., Inc.*, No. 05-0451, 2008 WL 205224, *18 (E.D. Pa. Jan. 23, 2008) (explaining that "a few incidents occur[ing] each year over an eleven-year period does not establish the type of frequency the Third Circuit" requires to establish a continuing violation.); *Wilkins v. ABF Freight Sys., Inc.*, No. 03-6610, 2005 WL 2271866, at *4 (E.D. Pa. Sept. 15, 2005) (refusing to apply the continuing violation doctrine where allegations related "to two

16

separate managers acting independently during two different time periods"). Therefore, the continuing violation doctrine is not applicable to Plaintiff's claims.

    2. Merits of Plaintiff's Claim

Even if Plaintiff could establish the application of the continuing violation doctrine, summary judgment would still be appropriate for several reasons related to the merits of Plaintiff's claim. In order to establish a *prima facie* case for a hostile work environment claim under Title VII and the PHRA, Plaintiff must demonstrate that (1) he experienced severe or pervasive conduct, (2) because of his sex, (3) the conduct detrimentally affected him, (4) the conduct would detrimentally affect a reasonable person under similar circumstances, and (5) the existence of *respondeat superior* liability. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). Defendant is correct in arguing that Plaintiff has failed to establish most if not all of these elements.

First, the Court has serious doubts that the alleged conduct was based on Plaintiff' sex. As the Supreme Court has held, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quoting 42 U.S.C. § 2000e–2(a)(1)). Accordingly, inappropriate conduct is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* There must be evidence that "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citation and quotation marks omitted). Here, only two of the comments – Gurtner's reference to Plaintiff as a "little boy" and Hedglin's statement in 2009 – were even tangentially related to Plaintiff's sex. While these comments may demonstrate that Plaintiff worked with seemingly unpleasant people, "when examined in context,

[they] appear far more hostile and angry than sexual." *Phillips v. Merch. Ins. Corp.*, 3 F. Supp. 2d 204, 206, 208 (N.D. N.Y. 1998) (granting summary judgment in favor of employer where supervisor commented that "she did not care whether [the plaintiff] had to 'dance naked in the snow' to get business," asked the plaintiff "if he thought he was a 'big man on campus,'" "directed profanity at him," and "called him names such as 'little boy,' 'tough son-of-a-bitch,' and 'dumb man'").

Second, the alleged comments and other actions fall short of the severity and pervasiveness required to establish a hostile work environment. In assessing whether a hostile work environment exists, the Court must consider the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citation and quotation marks omitted). It is well settled that "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough." *Shaw v. Pittsburgh Bd. of Pub. Educ.*, No. 07-1183, 2009 WL 86709, at *6 (W.D. Pa. Jan. 12, 2009) (citation and quotation marks omitted). All of the conduct alleged, from the 1991 comment by Gurtner to the removal of Plaintiff's lunch, fails under that standard. In fact, many of the incidents, such as the request that Plaintiff clean the refrigerator, the encounter with Palombi over the pizza, and the incident with Gurtner about the hamster, were totally benign. In addition, the incidents were far too infrequent to amount to a hostile work environment. *See, e.g.*, *id.* at *7 (concluding that nine instances of harassment over ten years was insufficient, even where plaintiff only had "rare" interactions with alleged harasser); *Ferguson*, 2008 WL 205224, at *18 (finding a few incidents each year over an eleven-year span insufficiently frequent to constitute a hostile work environment). Nor has Plaintiff adduced any evidence that his work performance

18

was affected in any way by this conduct.

In sum, the Court finds that the majority of Plaintiff's allegations with respect to his hostile work environment claim are untimely and that the continuing violation doctrine does not render them otherwise. Furthermore, even assuming Plaintiff could have established the doctrine's application, Plaintiff's claim would still fail. Plaintiff's supervisors and co-workers may have displayed varying degrees of personal disdain for him over the years, but there is no evidentiary basis for concluding that their comments and actions were directed at him on account of his gender or that the conduct was so severe or pervasive as to alter the conditions of his work. Defendant UPMC Horizon's motion for summary judgment will, therefore, be **GRANTED** with respect to Plaintiff's hostile work environment claims.

### IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** the MOTION FOR SUMMARY JUDGMENT (ECF No. 32) filed by UPMC Horizon. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRY GALE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UPMC HORIZON, )<br>)<br>Defendant. ) | 2:12-CV-00617 |

## ORDER OF COURT

**AND NOW,** this 7th day of October, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that Defendants' MOTION FOR SUMMARY JUDGMENT (ECF No. 32) is **GRANTED**. The clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc: **Neal A. Sanders**
Email: lonas@earthlink.net
**Dirk D. Beuth**
Email: dbeuth@windstream.net
**Shelly R. Pagac**
Email: srp@pietragallo.com